UNITED STATES of America, Appellee,

v.

Joseph Jesse ESPINOZA, Appellant.

No. 79–5035.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 8, 1980.

Decided Feb. 5, 1981.

Rehearing and Rehearing En Banc Denied March 9, 1981.

---

**156**

Roger Jon Diamond, Pacific Palisades, Cal. (Hecht, Diamond & Greenfield, Pacific Palisades, Cal., on brief), for appellant.

E. Leslie Hoffman, III, Asst. U. S. Atty., Charleston, W. Va. (Robert B. King, U. S. Atty., James S. Arnold, Asst. U. S. Atty., Charleston, W. Va., on brief), for appellee.

Before HALL and PHILLIPS, Circuit Judges, and STAKER, District Judge.*

STAKER, District Judge:

Joseph Jesse Espinoza, appellant here, and J–E Enterprises, Inc., a California corporation (J–E), were jointly indicted and tried, and each was found guilty and convicted, in the United States District Court for the Southern District of West Virginia, at Charleston, upon each of two counts, the first charging that in violation of 18 U.S.C. § 371, they conspired with each other and others to, and the second that in violation of 18 U.S.C. § 2, they aided and abetted each other and others to, transport in interstate commerce from California to Charleston, West Virginia, obscene films and magazines concerning and involving children, commonly called "kiddie porn," in violation of 18 U.S.C. § 1465. On appeal of his conviction Espinoza assigns constitutional and other errors. We affirm.

J–E did not appear at the trial nor at any of the proceedings had under the indictment.

The following is a brief narrative of some of the evidence:

Clifford J. Holdren, Jr., owner-operator of Kip's Discount, a retail outlet dealing in sexually explicit matter in Charleston, West Virginia, testified that in response to an order for kiddie porn placed by him in a telephone conversation with "Joe," at J–E's place of business in California, the items of kiddie porn mentioned in the indictment, consisting of magazines and films, were shipped from J–E in California, to Kip's Discount in Charleston, by Greyhound Bus,

---

* The Honorable Robert J. Staker, United States District Judge for the Southern District of West Virginia, at Huntington, sitting by designation.

and that in March, 1977, he delivered to Special Agent Robert Sylvester, of the Federal Bureau of Investigation (FBI), those items of kiddie porn and invoices, cancelled checks and other documents pertaining to that transaction.

Espinoza's defense was that he could not be guilty of the charges, because throughout the period from the fall of 1976 to the spring of 1977, that being the period in which the violations were charged to have occurred, he was not involved in or with J–E's business operations to the extent that he could have been implicated in, or even aware of, those violations if they did, in fact, occur. He testified that he caused J–E to be incorporated in April, 1974, for the purpose of wholesaling and distributing adult-oriented, sexually explicit matter from a building housing J–E's warehouses and Espinoza's office, located at 1032 South Gerhart Avenue, Commerce, California (warehouse), and then became J–E's president; that during the ensuing year, he commenced several other businesses;[1] that sometime during the year 1975, he resigned as the president and an officer of J–E, but continued to maintain his office in the warehouse, from which he managed and attended to those other businesses; and that upon his resignation, he was succeeded by Manuel Lopez, who commenced to manage and operate J–E as its president, after which he, Espinoza, no longer helped or assisted J–E at all, though Espinoza admitted in other testimony that from time to time he did assist J–E as aid might be needed in J–E's rubber department, talked on the "phone" about certain aspects of J–E's business in terms of goods ordered and shipped, and occasionally handled invoices of J–E. He further testified that in about March, 1977, Manuel Lopez disappeared and ceased his affiliation with J–E, whereupon he, Espinoza, resumed its management and operations.

### I.

Prior to trial Espinoza moved, pursuant to Rules 21(b) and 22 of the Federal Rules of Criminal Procedure (F.R.Cr.P.), that the venue of his cause be transferred from the Southern District of West Virginia to the Central District of California.

Filed with and in support of that motion were Espinoza's and his counsel's affidavits asserting that he could not financially afford the expense of causing himself, his counsel and his California witnesses to appear in West Virginia for trial, that all of them would be greatly inconvenienced if they were required to do so and that it would be virtually impossible for him to receive a fair trial in West Virginia, given his limited financial resources.

The court conducted an *ex parte* proceeding, pursuant to Rule 17(b), F.R.Cr.P.,[2] at which Espinoza's counsel was requested to reveal to the court the identity of those witnesses and generally what testimony they were expected to give at trial, all for the limited purpose of enabling the court to determine which of them necessarily must, and which need not, be subpoenaed at government expense to be present at Espinoza's trial for his adequate defense. Espinoza's counsel complied with the court's request "under protest." The court took effective steps to assure that all such revelations made by Espinoza's counsel would, as they did, remain further undivulged and inviolate.

Espinoza here asserts that the court erred in compelling him to disclose his defense in

---

1.  Those other businesses included: El Cid Book Productions, operating book stores in Alhambra and Bell, California; Spartan Mail Service, a business dealing in "explicit sex" materials; Four Star Products, a business manufacturing and selling rubber goods; and Suzette's Model Studio, where 18-year-old girls rented rooms from Espinoza where they posed for individual and professional photographers in shifts assigned by Espinoza.

2.  Rule 17(b), F.R.Cr.P., provides in part:

    (b) Defendants Unable to Pay. The court shall order at any time that a subpoena be issued for service on a named witness upon an *ex parte* application of a defendant upon a satisfactory showing that the defendant is financially unable to pay the fees of the witness and that the presence of the witness is necessary to an adequate defense.

order for him to obtain subpoenas at government expense. He argues that he, as an indigent defendant, was lawfully entitled to have witnesses subpoenaed to testify in his defense at government expense without his being required to reveal to the court what the testimony of those witnesses would be, in the same manner as a non-indigent defendant has the right to subpoena witnesses in his defense at his own expense without being so required, and that the court's requiring him to divulge the testimony of his witnesses for that limited purpose constituted the court's compelling him to disclose his defense in violation of his Sixth Amendment right to compulsory process and his Fifth Amendment right to due process of law.

Under the procedure prescribed by Rule 17(b), prior to the 1966 amendment thereof,[3] before the court could order a subpoena to be issued at government expense for a witness to testify in defense of an indigent defendant, the defendant was required to make a motion or request supported by an affidavit stating the name and address of, and the testimony expected to be elicited from, each witness that he desired so to testify, and that such testimony was material to his defense. That procedure was not conducted *ex parte*, and some asserted it to be constitutionally objectionable in that it practically operated to compel an indigent defendant to disclose in advance the theory of his case to his government adversary. That procedure evoked just criticism,[4] because while each of the government and a defendant able to pay for subpoenas were permitted to have subpoenas issued in blank without being required so to disclose, an indigent defendant was so required.

Rule 17(b), as amended in 1966, provides in pertinent part that "[t]he court shall

order ... that a subpoena be issued for service on a named witness upon an *ex parte* application of a defendant upon a satisfactory showing that the ... presence of the witness is necessary to an adequate defense." That 1966 amendment removed the constitutionally objectionable procedure from the provisions of Rule 17(b), as it theretofore provided, and substituted the constitutionally unobjectionable procedure of permitting such disclosure to be made to the court *ex parte*, thus assuring that the government not become privy thereto.

Indeed, while this Court deprecates departure from the *ex parte* requirement of the procedure prescribed by Rule 17(b), as amended, departure therefrom in a manner which results in disclosure of the theory of an indigent defendant's defense to the government does not always constitute prejudicial error. *See United States v. Panczko*, 429 F.2d 683, 689 (7th Cir. 1970), *cert. denied*, 400 U.S. 946, 91 S.Ct. 253, 27 L.Ed.2d 252 (1970); *United States v. Smith*, 436 F.2d 787, 790 (5th Cir. 1971), *cert. denied*, 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1971).

Here, the court strictly complied with the *ex parte* procedure mandated by Rule 17(b), as amended, in consequence of which any disclosure by Espinoza of his defense was made to the impartial court only, and not to his government adversary. Hence, his Fifth and Sixth Amendment rights were not thereby violated, as he asserts, nor was he prejudiced by the court's actions.

## II.

■ At that Rule 17(b) *ex parte* proceeding, the court found that of twenty-nine witnesses for whom Espinoza requested

---

**3.** Prior to the 1966 amendment thereof, Rule 17(b) provided in pertinent part:

(b) Indigent Defendants. The court or a judge thereof may order at any time that a subpoena be issued upon motion or request of an indigent defendant. The motion or request shall be supported by affidavit in which the defendant shall state the name and address of each witness and the testimony which he is expected by the defendant to give

if subpoenaed, and shall show that the evidence of the witness is material to the defense, that the defendant cannot safely go to trial without the witness and that the defendant does not have sufficient means and is actually unable to pay the fees of the witness.

**4.** *See* Notes of Advisory Committee on Rules, Note to Rule 17(b), pertaining to the 1966 amendment thereof.

subpoenas at government expense, the presence of twenty-five of them was reasonably necessary to his adequate defense and ordered that at government expense subpoenas be issued in blank for his use to require their presence.

During that proceeding, Espinoza's counsel stated that while Espinoza was "still involved somewhat as an employee," he was not the "one in charge," of J–E during the period as charged, and contended that the presence of the four other of the twenty-nine witnesses was necessary for his adequate defense, because they would be able to explain certain public documents and records as well as to testify that Manuel Lopez, rather than Espinoza, actively represented J–E as its president in J–E's transactions evidenced by those documents and records, and that counsel was "afraid that the jury would lose the impact of the evidence if it merely came in the form of a document."

The court found that the presence of the other four witnesses, all public officials, was not so necessary, because their sole purpose at trial would have been to present self-authenticating documents and records, the admission of which into evidence would have provided the evidence to which those witnesses assertedly would have testified, and refused to order issuance of subpoenas for them at government expense.

Espinoza assigns such refusal as error, arguing that it violated his rights under the Fifth and Sixth Amendments and under the provisions of Rule 17(b); that the provisions thereof are mandatory and must be interpreted to permit a defendant to produce witnesses whom he, not the court, deems necessary; and that only if a witness is wholly unnecessary should the court be able to deny a Rule 17(b) request, else wealthy defendants would be able to present better defenses than indigent ones could.

■ In deciding whether to issue subpoenas sought by an indigent defendant pursuant to Rule 17(b), a trial court must take into account the right to compulsory process under the Sixth Amendment, and the Fifth Amendment due process guarantee against discrimination. *United States v. Bennett*, 539 F.2d 45 (10th Cir. 1976), *cert. denied*, 429 U.S. 925, 97 S.Ct. 327, 50 L.Ed.2d 293 (1976). But the right to subpoena witnesses at government expense pursuant thereto is not an absolute one. *United States v. Martin*, 567 F.2d 849 (9th Cir. 1977). It understandably lies within the sound discretion of the court. *United States v. Owens*, 528 F.2d 1176 (4th Cir. 1975). And in the exercise of that discretion the court need not grant a defendant's request to subpoena witnesses whose testimony would be cumulative. *Thompson v. United States*, 372 F.2d 826 (5th Cir. 1967).

A critical examination of the record indicates that the testimony those four witnesses were expected to provide was provable by the documentary evidence involved, and that their presence was not necessary for Espinoza's adequate defense. The court did not abuse its discretion by refusal of Espinoza's request, no error or prejudice resulted from that refusal and none of Espinoza's constitutional rights were infringed thereby.

### III.

■ Espinoza claims the court erred by overruling his motion to transfer his trial to the Central District of California, based on Rules 21(b)[5] and 22, F.R.Cr.P., and the United States Constitution, Article 3, Section 2, Clause 2, and the First, Fifth and Sixth Amendments thereto.

He first argues that in so doing the court erroneously relied upon *United States v. McManus*, 535 F.2d 460 (8th Cir. 1976), *cert. denied*, 429 U.S. 1052, 97 S.Ct. 766, 50 L.Ed.2d 769 (1977),[6] and indeed asserts that *McManus* itself was erroneously decided.[7]

---

**5.** Rule 21(b) provides:

Transfer in Other Cases. For the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding as to him or any one or more of the counts thereof to another district.

**6.** In *McManus*, the defendants were charged in the Southern District of Iowa with mailing obscene matter to Iowa from California, in violation of 18 U.S.C. §§ 1461 and 1462, and to enhance the success of their Rule 21(b) motion

**7.** See note 7 on page 160.

Filed with his Rule 21(b) motion were the affidavits of Espinoza and his counsel wherein he offered to stipulate the testimony of any West Virginia witnesses whom the government would call to testify in California, should transfer there be ordered, and he thereby created precisely the same issues as those which led the court in *McManus* to hold that the trial court abused its discretion by ordering transfer.

Rule 22, F.R.Cr.P., provides: "A motion to transfer under these rules may be made at or before arraignment or at such other time as the court or these rules may prescribe." By order entered on August 10, 1978, the court set August 28, 1978, as the last day upon which pre-trial motions could be filed.

At the hearing of his motion on September 15, 1978—some seventeen days after the last date set by the court upon which pre-trial motions could be filed, and ten days before the scheduled trial date—Espinoza appeared by counsel only and then filed at bar his second affidavit wherein he additionally offered, if his motion to transfer were granted but not otherwise, to stipulate for purposes of his trial in California that the films, etc., charged in the indictment to have been obscene were in fact criminally

obscene as charged, his avowed purpose in making this additional offer having been to circumvent any adverse factors the *McManus* decision might pose to the granting of his motion to transfer.[8]

The government declined to accept and join in either of Espinoza's offers to stipulate.

In the context of the requirement of *Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974)—that obscenity must be determined by applicable local contemporary community standards— the legal effect of the stipulation offered by the defendants in *McManus* critically differed from that offered by Espinoza here, in that in *McManus* the defendants merely offered in the Iowa court to stipulate at the California trial to the *testimony* of the Iowa witnesses, and transfer to California, upon acceptance of that offer, would still have left the California jury faced with having to decide, as required in *Hamling*, the issue of the obscenity of the matter mailed, as measured by the local contemporary standards obtaining in Iowa, whereas Espinoza's offer in the West Virginia court to stipulate at the California trial to the *obscenity* of the films, etc., as charged, would have constituted his admitting the obscenity element of the crimes charged, and upon acceptance thereof, and the transfer of the case, not

to transfer to the Central District of California, offered in the Iowa court to stipulate to the testimony of Iowa witnesses at the California trial, if transfer were ordered, including that of those of them who would testify that the matter mailed was obscene. The District Court ordered, and the government brought mandamus to avoid, the transfer to California. The circuit court held that the requirements of *Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974)—that obscenity must be determined by applicable local contemporary community standards—coupled with the government's decision to bring the indictment against defendants in Iowa, mandated that the obscenity *vel non* of the materials mailed be determined according to the Iowa contemporary community standards, that the District Court had abused its discretion by ordering transfer, and ordered the cause recalled from California to the Iowa court for trial, having noted in so holding that the District Court for the Central District of California had theretofore held, upon transfer thereto from the

Southern District of Iowa of the trial of earlier indictments charging the same defendants with substantially the same charges, that contemporary community standards in Iowa could not be proven solely by means of expert testimony and that a jury from the Central District of California could not determine those Iowa standards, as required by *Hamling*, and for those reasons had dismissed the earlier indictments.

7. Both Espinoza's counsel and counsel for respondent in *McManus* was a Mr. Roger Jon Diamond of Pacific Palisades, California.

8. Espinoza's counsel must have been keenly aware of the effect of the *McManus* decision upon the possible success of Espinoza's Rule 21(b) motion. His delaying the making of Espinoza's offer to stipulate to the obscenity until September 25, 1978, so close to the trial date and so long after the motion was filed, is thus puzzling.

only would the government have been thereby relieved of proving, but the California jury would have been relieved of having to decide, as required by *Hamling*, the issue of whether the matter charged to have been obscene was obscene as charged, as measured by local contemporary standards obtaining in the Southern District of West Virginia.

The *McManus* decision thus posed no impediment to the granting of Espinoza's motion, and while the court mentioned *McManus* in its decision denying the motion, it did not, as Espinoza asserts, base denial thereon.

The court denied the motion for other reasons, holding that Espinoza's affidavit containing his offer to stipulate obscenity constituted an entirely new ground, and in effect a new motion, for the transfer, and that filed as it was so long after pre-trial motions were ordered to have been submitted and so near to trial, it was untimely filed under Rule 22, F.R.Cr.P.

Espinoza argues that his affidavit offering to stipulate obscenity was not a new motion, but rather was his answer to the government's response to his original motion to transfer. Regardless of nomenclature, the argument lacks persuasiveness. From the outset, Espinoza's counsel must have been intimately familiar with the issues dealt with in *McManus*, and with the Central District Court of California's policy to dismiss indictments transferred to it charging obscenity, wherein the defendants had agreed to stipulate merely to the testimony of witnesses from the transferring jurisdiction, as narrated in the *McManus* opinion.[9] Yet, when the government refused to accept Espinoza's offer to stipulate merely to the testimony of West Virginia witnesses, he waited until ten days before trial to offer to stipulate the obscenity, and then did not personally appear before the court to do so. These circumstances closely match those in *Cagnina v. United States*,

223 F.2d 149 (5th Cir. 1955), where the court held that a motion to transfer, filed many weeks after arraignment and not until about a week before trial, was made too late, citing Rule 22, F.R.Cr.P. Under the circumstances, the court did not abuse its discretion or commit error by treating Espinoza's offer to stipulate obscenity as having been untimely filed.

The court further reasoned that in the light of Espinoza's having stated in his first affidavit filed with the motion that he did not know, nor had he ever known "what the standards of the State of West Virginia are with respect to films and books depicting sexual activities," and his counsel's having stated at the hearing that "[w]e don't concede that it is obscene, but we would offer to stipulate if that were the basis for the objection and the basis for the court's ruling," coupled with Espinoza's not having been present for the court to examine him to determine whether his offered stipulation to the obscenity, a central element of the crimes charged, had been voluntarily, knowingly and intelligently entered by him, serious question might very well arise after transfer as to whether he had done so, for which additional reasons the court denied the motion to transfer.

Espinoza also argues that his offer to stipulate the obscenity element was in effect an offer to enter a "partial guilty plea," which he was entitled to enter.

In *United States v. Harding*, 491 F.2d 697, 698 (10th Cir. 1974), *on remand*, # 71–CR–297 (D.Colo.1974) (unpublished), *on appeal*, 507 F.2d 294 (10th Cir. 1974), *cert. denied*, 420 U.S. 997, 95 S.Ct. 1437, 43 L.Ed.2d 679 (1975), the court recognized the partial guilty plea concept by stating that "[a] stipulation to obscenity is in effect a limited plea of guilty and . . . should . . . be permissible if done freely and voluntarily."

**9.** Apparently Espinoza hoped the court and government would unwittingly accept his offer to stipulate merely to the testimony of the West Virginia witnesses, that transfer would be ordered on that basis and that upon transfer the indictment would be dismissed by the District Court of the Central District of California, as occurred with the first indictments mentioned in *McManus*.

In *Henderson v. Morgan*, 426 U.S. 637, 650, 96 S.Ct. 2253, 2260, 49 L.Ed.2d 108 (1976) (White, J. concurring), the following observation was made:

It cannot be "harmless error" wholly to deny a defendant a jury trial on one or all elements of the offense with which he is charged. Similarly, it is too late in the day to permit a guilty plea to be entered against a defendant solely on the consent of the defendant's agent—his lawyer. Our cases make absolutely clear that the choice to plead guilty must be the defendant's: it is he who must be informed of the consequences of his plea and what it is that he waives when he pleads, *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); and it is on his admission that he is in fact guilty that his conviction will rest.

Rule 11, F.R.Cr.P.,[10] expressly requires a defendant to be personally present before the court at the time of his entry of a guilty plea so that the court may determine, before accepting the plea, that it is voluntarily, knowingly and intelligently entered by him. No less is required for the entry of a so-called "partial guilty plea," particularly in circumstances as here where Espinoza manifested such duplicity in his two affidavits.

Espinoza's contention that he had the right to be tried in the Central District of California, the jurisdiction of his residence, under the United States Constitution, Article 3, Section 2, Clause 2, and the First, Fifth and Sixth Amendments thereto, is not well taken. *See* 18 U.S.C. § 3237(a); *Platt v. Minnesota Mining & Manufacturing Co.*, 376 U.S. 240, 245–46, 84 S.Ct. 769, 772, 11 L.Ed.2d 674 (1964); *Reed Enterprises v. Clark*, 278 F.Supp. 372, 376 (1967), *aff'd*, 390 U.S. 457, 88 S.Ct. 1196, 20 L.Ed.2d 28 (1968); *United States v. McManus, supra.*

■ The question of transfer under Rule 21(b) is within the court's discretion, and its action can be reversed only for an abuse of that discretion. *Scott v. United States*, 255 F.2d 18 (4th Cir. 1958), *cert. denied*, 357 U.S. 942, 78 S.Ct. 1392, 2 L.Ed.2d 1555 (1958).

Under the circumstances here, we find no abuse of discretion by the trial court in its denial of Espinoza's Rule 21(b) motion.

### IV.

■ Espinoza contends the court erred by denying his motion to suppress evidence seized by Special Agent Dauwalder of the FBI, in the search of J–E's warehouse on August 13, 1976, under authority of a search warrant.[11]

The search warrant was issued on August 13, 1976, by a United States Magistrate in Los Angeles, California, was based upon affidavits of Agent Dauwalder and the affidavit of FBI Agent Murray attached thereto,[12] and authorized the search of the ware-

10. Rule 11, F.R.Cr.P., provides in part:
    (d) Insuring That the Plea is Voluntary. The court shall not accept a plea of guilty . . . without first, by addressing the defendant personally in open court, determining that the plea is voluntary and not the result of force or threats or of promises apart from a plea agreement . . . .

11. The search warrant was issued and executed relative to the investigation of a shipment of obscene materials from J–E, in California, to Phil's Boies (Phil's Adult Book Store) in Las Vegas, Nevada, rather than to the investigation of the crimes charged here, and evidence seized in that search, which was the subject of the motion, were photographs taken inside the warehouse during the search.

12. In Agent Dauwalder's affidavits he stated, *inter alia*, that Special FBI Agent Joseph A. Murray, of the Las Vegas, Nevada FBI Office, told him, Agent Dauwalder, that in executing a search warrant at Las Vegas Transfer and Storage Company, in Las Vegas, on August 12, 1976, Agent Murray had seized three cartons which had been shipped by Ameri-Con Freight System from J. E. Est. Inc., 1032 South Gerhart, Commerce, California, to Phil's Boies, 1149 Las Vegas Boulevard South, Las Vegas, Nevada, as shown by the bill of lading thereon, and that Agent Murray had seized from those cartons, among other obscene magazines, a copy of one entitled "Erotic Hands." Attached to and incorporated by reference into Agent Dauwalder's affidavits was the affidavit of Agent Murray wherein he stated, *inter alia*, that a confidential informant, who had demonstrated his accuracy and reliability as such by providing Agent Murray on several occasions with explicit and detailed confidential informa-

house and the seizure of the following items:

> obscene magazines including, but not limited to magazines entitled "Erotic Hands" . . .; records, freight documents, checks, check stubs, money orders, invoices, receipts, sales ledgers, memorandum, correspondence, and accounting records which show the sale or distribution of obscene matter in interstate commerce and records and documents which reflect ownership of such obscene magazines which were shipped in interstate commerce; which are the fruits, instrumentalities, and evidence of violations of Title 18, United States Code, Sections 1462 and 1465.

Agent Murray's affidavit, attached to Agent Dauwalder's affidavit presented to the magistrate upon application for the search warrant, stated that the magazine "Erotic Hands" contained:

> 36 pages with at least one photograph on every page, some photographs in color and some photographs in black and white. The photographs depict numerous scenes of nude, white males performing fellatio on one another; fondling each others genital area; performing analingus; performing anal intercourse; and numerous scenes of one nude, white male with his fist and part of his arm inside another nude, white male's rectum.

Agent Dauwalder did not have a copy of "Erotic Hands" to present for examination by the magistrate who issued the search warrant.[13]

Espinoza argues that the magistrate did not view "Erotic Hands" for the purpose of determining either probable cause or obscenity or ascertaining whether the con-

tents thereof were artistic, scientific, educational or had other characteristics to warrant First Amendment protection, but to make those determinations rather relied upon the written description of those contents contained in Agent Murray's affidavit, which was incomplete in that it neither indicated whether it encompassed the entire magazine, nor revealed the accompanying text nor in any way set forth the elements prescribed in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), *rehearing denied*, 414 U.S. 881, 94 S.Ct. 26, 38 L.Ed.2d 128 (1973), and thus, that there was no probable cause to believe that "Erotic Hands" was obscene nor that it was located at J–E's warehouse.

The Supreme Court has stated that "[a]t a minimum, prurient, patently offensive depiction or description of sexual conduct must have serious literary, artistic, political, or scientific value to merit First Amendment protection," *Miller v. California, supra* at 26, 93 S.Ct. at 2616, that where the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with "scrupulous exactitude," *Stanford v. Texas*, 379 U.S. 476, 485, 85 S.Ct. 506, 511, 13 L.Ed.2d 431 (1965), *rehearing denied*, 380 U.S. 926, 85 S.Ct. 879, 13 L.Ed.2d 813 (1965); and that the procedure for determining probable cause must afford an opportunity for the judicial officer to "focus searchingly on the question of obscenity," *Marcus v. Search Warrant*, 367 U.S. 717, 732, 81 S.Ct. 1708, 1716, 6 L.Ed.2d 1127 (1961), but it has not, nor has any other court in any reported decision remaining unreversed that we are able to discover, held that the viewing of printed or pictoral matter presumptively protected by the

---

tion concerning violations of 18 U.S.C. §§ 1462 and 1465, later found by Agent Murray's independent investigations *to be reliable and accurate, and who had once provided Agent Murray with reliable and accurate confidential information leading to the arrest of a fugitive from justice, had on several occasions been observed by Agent Murray to be on the premises of Phil's Adult Book Store, at its Las Vegas address, and that on August 9, 1976, that informant had provided Agent Murray with a maga-*

zine entitled "Erotic Hands," and had stated to Agent Murray that he had observed that magazine to be on sale at Phil's Adult Book Store in Las Vegas.

**13.** The only copy of "Erotic Hands" available to Agents Dauwalder and Murray had been presented by Agent Murray to the Las Vegas Magistrate in connection with his application for the issuance of the Las Vegas search warrant.

First Amendment is lawfully requisite to a judicial officer's determining that probable cause exists to believe that such matter is obscene.

In *United States v. Sherwin*, 572 F.2d 196 (9th Cir. 1977), *cert. denied*, 437 U.S. 909, 98 S.Ct. 3101, 57 L.Ed.2d 1140 (1978), the affidavits of FBI agents relied on by the magistrate in issuing the search warrant stated that a coming shipment of explicit magazines, including "Private No. 8," contained color photographs of "completely nude males and females engaging in various sexual activities, including sexual intercourse, cunnilingus, oral copulation and other sexually explicit acts," and defendants contended, as does Espinoza here, that the affidavits were insufficient to provide probable cause to believe that any crime was committed because they gave no reason to believe that the materials were obscene. The court held that the description in the affidavit gave specific facts as to the magazine's contents, was more than a mere conclusion on the agent's part, was sufficient to allow the magistrate to make his own determination of probable cause and that the search warrant was properly issued.

In *United States v. Middleton*, 599 F.2d 1349 (5th Cir. 1979), where the search warrant was also based solely upon the affidavit of FBI agents describing in detail twelve scenes of explicit sex depicted in a 65-minute-long movie, and the defendants contended it to have been issued without probable cause, and made substantially the same arguments as those made by Espinoza here, the court held that common sense indicated that explicit sex scenes consumed a substantial portion of the entire film time, and this fact, combined with the film's repetitive emphasis on genitals during sex acts and its depiction of a panoply of sexual conduct, effectively diminished any reasonable expectation that twelve scenes of explicit sex could be fragmented portions of a film which, taken as a whole, had serious literary, artistic, political, or scientific value, and that the magistrate could reasonably have found probable cause justifying issuance of a search warrant authorizing seizure of the film.

■ Only an affidavit that sufficiently states probable cause for the necessity of a search, and wherein the affiant states underlying facts which substantiate his conclusion, may form the basis for the issuance of a search warrant. *United States v. Pinkerman*, 374 F.2d 988, 989 (4th Cir. 1967).

In *Kois v. Wisconsin*, 408 U.S. 229, 231, 92 S.Ct. 2245, 2246, 33 L.Ed.2d 312 (1972), the Court remarked that "[a] quotation from Voltaire in the flyleaf of a book will not constitutionally redeem an otherwise obscene publication . . . ." We would observe here that it is well-nigh impossible to imagine the contents of a text accompanying any of the depictions in "Erotic Hands," as described in the affidavits, which would constitutionally have redeemed their obscene character by imparting to them any serious literary, artistic, political, or scientific value and thereby First Amendment protection.

Here, the description of the contents of "Erotic Hands," contained in the affidavits of the FBI agents, graphically described the explicit sexual acts depicted therein, and in so doing stated the underlying facts upon which the magistrate himself could independently find probable cause to believe that magazine to be obscene. We hold that the magistrate properly found probable cause and the obscenity of "Erotic Hands" on the basis of the description thereof set forth in the affidavits.

■ Espinoza further argues that the search warrant was overbroad, and thus invalid, in that it purported to authorize its executing FBI agents to search for and seize "obscene magazines," with the exception of "Erotic Hands," which was particularly named in the warrant, as well as documents relating to such unspecified "obscene magazines."

That same argument, made upon substantially the same facts, was recently dealt with by this court in *United States v. Torch*, 609 F.2d 1088 (4th Cir. 1979), *cert. denied*, 446 U.S. 957, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980), wherein the warrants authorized the seizure of

records, documents, and writings related to the transportation, sale and distribution in interstate commerce of lewd, lascivious and filthy films, including route book, billing invoices, cash sales slips, credit memos, and other similar type documents, together with copies of lewd, lascivious, and filthy films and magazines, including a film labeled "Dog Fucker" (*Id.* at 1089),

and the district court held that the warrants authorized the seizure of two different kinds of property: (1) business records kept by Torch and his employer pertaining to the transportation of obscene materials; and (2) the allegedly obscene materials themselves, and held the warrants invalid as to the films and magazines themselves, except the film "Dog Fucker," which was particularly named therein, but valid as to the business records.

Upon appeal here, this court affirmed, and in so doing stated:

The requirement set forth in the Fourth Amendment that things to be seized be particularly described is to prevent "a general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971). This is accomplished by removing from the officer executing the warrant all discretion as to what is to be seized . . . . [T]he particularity requirement is even more stringent where the things to be seized have the presumptive protection of the First Amendment: "the constitutional requirement that warrants must particularly describe the 'things to be seized' is to be accorded the most scrupulous exactitude when the 'things' are books, and the basis for their seizure is the ideas they contain." *Stanford v. Texas*, 379 U.S. 476, 485, 85 S.Ct. 506, 511, 13 L.Ed.2d 431 (1965). A warrant may not simply direct the officers to seize "obscene" materials, leaving it to the officers to decide what is "obscene" and what is not. *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); *Marcus v. Search Warrant*, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961). *See also*

*Heller v. New York*, 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973); *Roaden v. Kentucky*, 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973).

. . .

. . . The Supreme Court in *Stanford*, 379 U.S. 476 [85 S.Ct. 506, 13 L.Ed.2d 431], was careful [however] to limit its holding there to materials under the presumptive protection of the First Amendment:

The word "books" in the context of a phrase like "books and records" has, of course, a quite different meaning. A "book" which is no more than a ledger of an unlawful enterprise thus might stand on a quite different constitutional footing from the books involved in the present case.

. . .

In contexts that do not involve First Amendment considerations, the test for the necessary particularity is a pragmatic one: "The degree of specificity required when describing the goods to be seized may necessarily vary according to the circumstances and type of items involved . . . [T]here is a practical margin of flexibility permitted by the constitutional requirement for particularity in the description of items to be seized." *United States v. Davis*, 542 F.2d 743, 745 (8th Cir. 1976).

Tested by this standard, we believe the warrants described with sufficient particularity the documents to be seized.

. . .

We believe this case falls within the "practical margin of flexibility."

*Id.* at 1089–90.

And here, for the same reasons, we believe that Espinoza's case falls within the same margin of flexibility, and hold that the warrant was not so overbroad as to be invalid.

## V.

During the search of J–E's warehouse, Agent Dauwalder made photographs of

various scenes of the interior thereof as they appeared in his plain view, including photographs depicting stacks of sexually explicit books and magazines, various business records, and a photograph of a business license issued on July 1, 1975, by the City of Commerce, California, to J–E, upon which Espinoza was shown to have been the "owner" of J–E, Agent Dauwalder having testified at the suppression hearing that the photographs were taken "so that there could be no allegation that we had exceeded the scope of authority," and that "[w]e have to show a commercial enterprise, that it's not just a—under Gates versus Ohio that it's not just a man that has a few magazines in his possession and inadvertently sent a few."

Espinoza assigns as error the making, and the admission into evidence, of some of those photographs, and particularly that of the business license, over his objection. He argues that the search warrant did not expressly authorize the making of photographs of the premises during the execution thereof, hence Agent Dauwalder exceeded the scope of the warrant by making them, and thereby executed his will in lieu of that of the neutral and detached magistrate.

He further argues that the photograph of the business license, stating as it did that he was the "owner" of J–E as of July, 1975, was hearsay and for that reason inadmissible.

█ Taking a photograph may, under some circumstances, constitute an unreasonable seizure. In *United States v. Johnson*, 452 F.2d 1363, 1371 (D.C.Cir.1971), the court indicated that the photographic seizure of one's person during an involuntary detention and prior to the police having probable cause to arrest the person "may run afoul of the Fourth Amendment's proscription against unreasonable searches and seizures."

█ It is well settled, however, that "objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." *Harris v.*

*United States*, 390 U.S. 234, 235, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968). It is also well settled that "mere evidence" may be the subject of a lawful seizure. In *Warden v. Hayden*, 387 U.S. 294, 306, 87 S.Ct. 1642, 1649, 18 L.Ed.2d 782 (1967), the Supreme Court said:

[I]t is reasonable, within the terms of the Fourth Amendment, to conduct otherwise permissible searches for the purpose of obtaining evidence which would aid in apprehending and convicting criminals. The requirements of the Fourth Amendment can secure the same protection of privacy whether the search is for "mere evidence" or for fruits, instrumentalities or contraband. There must, of course, be a nexus—automatically provided in the case of fruits, instrumentalities or contraband—between the item to be seized and criminal behavior.

This court addressed the issue somewhat obliquely in *Sallie v. State of N. C.*, 587 F.2d 636 (4th Cir. 1978). Sallie had been convicted of second degree murder in a state court and sought habeas corpus relief in the United States District Court, urging *inter alia* that he was denied effective assistance of counsel, because his appointed attorney had neither moved to suppress pictures taken by a police officer in Sallie's mobile home on grounds that the search thereof was unreasonable, nor objected to their admission into evidence at trial, and that he was entitled to relief on that Sixth Amendment ground.

The district court denied Sallie's petition. This court affirmed, holding that it was not precluded from awarding habeas corpus relief on Sixth Amendment grounds if Sallie's defense attorney had failed to object to the admission of evidence clearly in violation of the Fourth Amendment, and in that context proceeded to decide the Fourth Amendment issues, and further held:

Thus, we think the officer's concern for "other children" in the light of the reported homicide provided a proper basis for him to enter the trailer and to conduct the search. *The plain view doctrine justified his arranging for photographs to*

*preserve the appearance of the interior.* (emphasis added).

*Id.* at 641.

■ The search warrant having been a valid one, it follows that Agent Dauwalder had the right to be in the positions which afforded him a plain view of the scenes photographed at J–E's warehouse. He articulated in his testimony, as required by *Warden v. Hayden, supra,* the nexus between those scenes photographed as mere evidence and the criminal activity under investigation.

Agent Dauwalder did not exceed the scope of the warrant by making the photographs of what he saw in plain view and to that extent "seizing" those views themselves as evidence.

■ One of the issues raised by Espinoza's argument that the photographs were hearsay and that their admission denied him his Sixth Amendment right of confrontation is whether evidence is rendered admissible at trial solely in virtue of its having been lawfully seized. The lawfulness of the seizure of evidence does not *ipso facto* render that evidence admissible at trial. Conversely, the assurance of the admissibility at trial of evidence is not a prerequisite to its lawful seizure, the determination of its admissibility being uniquely a function of the trial judge.

■ The second issue raised is whether the photographs, including that of the business license, having been lawfully seized, were admissible under the Federal Rules of Evidence (F.R.E.) at the joint trial of Espinoza and J–E. In the absence of objection by J–E, those photographs were admissible against J–E as tending to establish that the warehouse was J–E's place of business from which it was actively conducting its business of dealing in and shipping of books, magazines, etc.

Rule 105, F.R.E., provides that "[w]hen evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."

■ Espinoza did not request the court to give a limiting instruction under Rule .105, though he did object to the admission of the photographs. It is incumbent upon a party to make such request, and a failure to do so generally precludes review of the question, but "where a serious prejudicial error in the conduct of a trial affects life or liberty a federal appellate court may notice and correct the error even though it was not called to the attention of the trial court." *Cleaver v. United States,* 238 F.2d 766 (10th Cir. 1956).

No serious or prejudicial error resulted to Espinoza from the admission of the photographs. Espinoza testified that he resigned as J–E's president in the year 1975, without specifying when he did so in that year, and that he was not the president or other officer of J–E during the period "from in or about the fall of 1976, until in or about the spring of 1977," in which the crimes were charged to have been committed. At no time did he testify that he was, or that he was not, the owner of J–E. The photographs of the business license showed no more than that as of July 1, 1975, he was either the "owner" or the "president" of J–E, the record not being clear as to which. Regardless of which it showed him to be, it did not tend to controvert the thrust of his defense or the testimony of him or his witnesses that he was not J–E's president or other officer when the crimes were committed.

The district court committed no prejudicial error by the admission of the photographs.

## VI.

Espinoza asserts that his rights under the Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States were violated, arguing that (1) no member of the jury who tried him was Mexican-American, and (2) the trial court summarily denied him the opportunity to establish that the absence of Mexican-Americans from that jury was the result of a deliberate policy to exclude them therefrom.

The record reflects that before the selection of the petit jury for the trial of Espinoza was commenced, his counsel, Mr. Diamond, expressed to the court his belief that from the names of the panel of petit jurors present, he concluded that none of them were Mexican-Americans or Chicanos and that Espinoza was of Mexican-American ancestry, and he stated that Espinoza "would object to proceeding. It seems to me that they have been systematically excluded."

Thereupon the Assistant United States Attorney commented to the court and Mr. Diamond that the court was "well aware of the fact that there are not that many individuals in the Southern District of West Virginia from Mexico or [sic] Chicano extraction," and that the "party making the objection to the panel on the basis of alleged irregularity or prejudice against a particular group has the burden of showing that in fact the process was irregular, and in fact that the group in question, that is, Mexican-Americans or Chicanos, were systematically excluded in the selection, and Mr. Diamond's objection certainly does not go as far as to make that kind of a showing."

Mr. Diamond then stated, "If there is a further procedure I must make to attack the petit jury, I would request leave to do so." The court then enquired of Mr. Diamond, "Do you have anything further?" Mr. Diamond answered, "No." The court said, "The motion is denied," and the trial proceeded.

■ The systematic exclusion of a particular class of persons "during the jury-selection process, resulting in jury pools not 'reasonably representative' of the community, denies a criminal defendant his right, under the Sixth ... [Amendment], to a petit jury selected from a fair cross section of the community." *Duren v. Missouri*, 439 U.S. 357, 358–59, 99 S.Ct. 664, 666, 58 L.Ed.2d 579 (1979). Persons of Mexican descent may constitute such a class. *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954). However, such systematic exclusion must be proven; it will not be presumed. *Tarrance v. Florida*, 188 U.S.

519, 23 S.Ct. 402, 47 L.Ed. 572 (1903); *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), *rehearing denied*, 381 U.S. 921, 85 S.Ct. 1528, 14 L.Ed.2d 442 (1965), and the defendant has the burden of establishing it. *Akins v. Texas*, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945), *rehearing denied*, 326 U.S. 806, 66 S.Ct. 86, 90 L.Ed. 491 (1945). The defendant must show, in order to establish a prima facie violation of the fair-cross-section requirement, "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri, supra* 439 U.S. at 364, 99 S.Ct. at 668.

■ It may be true that Espinoza's trial jury included no Mexican-Americans, but as the above quoted exchanges among the court, the Assistant United States Attorney and Espinoza's counsel clearly demonstrate, the court did not, as he asserts, deny him an opportunity to establish that the absence of Mexican-Americans from that jury was the result of a deliberate policy systematically to exclude them therefrom. The Assistant United States Attorney plainly informed Espinoza's counsel that he had the burden of making a showing and that his actions and comments to the court were not sufficient to constitute such showing. He therefore knew that more was lawfully required of him to do so. The court then specifically enquired of him as to whether he "had anything further," thereby extending him the opportunity to do what the law required of him if he desired further to pursue the matter, and he replied that he did not.

He may not impute to the court as its error his failure or refusal further to pursue the matter.

VII.

■ Espinoza claims the court erred by permitting witness Holdren to testify to his

telephone conversations with Espinoza, arguing that since Holdren had never met him, Holdren could not identify him as the person with whom Holdren spoke at J–E.

Holdren testified that he communicated by telephone with J–E on at least four occasions, always speaking with "Joe," concerning ordering, pricing and shipping adult materials and kiddie porn, some of those conversations having been initiated by him and some by J–E; that two of those conversations dealt with kiddie porn; that when Holdren called J–E, a lady would answer the telephone, Holdren would ask for "Joe" and a man would get on the telephone and say, "This is 'Joe';" and that in one of those conversations with Joe, he ordered kiddie porn from J–E as a result of which kiddie porn was shipped to Kip's Discount from J–E by Greyhound Bus.

Holdren could not pinpoint the exact dates upon which he talked with Joe, however, a telephone company statement rendered to Kip's Discount was admitted into evidence and showed charges for calls made on November 2 and 3, 1976, from Kip's Discount to a California telephone number shown to be that of J–E on J–E's invoices rendered to Kip's Discount. Two of those invoices bore Espinoza's fingerprints, as testified to by an expert witness. One of the two, invoice 4002, listed several items as having been sold and shipped by J–E to Kip's Discount, including the item "bulbs," which Holdren testified "checked out [as against the merchandise actually received by Kip's Discount from J–E under that invoice] to be kiddie porn."

Also admitted into evidence was Kip's Discount's cancelled check, signed by Holdren, written to J–E in payment of invoice 4002 and identifying that invoice on the face of the check.

Holdren further testified that he had never met "Joe," and that if he saw him at trial he would not know him. On direct examination, the government asked, and Holdren answered:

Q *Did* you know Joe by any other name or any further names?" (emphasis added).

A I *know* Joe by Joe Espinoza. (emphasis added).

The differences in the verb tenses of the question and answer were not further explored to ascertain just what Holdren's answer meant.

Witness Ganley, a member of the Los Angeles Police Department Administrative Division, Pornography Unit, identified Espinoza at trial and testified that he had J–E's warehouse under surveillance for two months during the period from the fall of 1976 to and including the spring of 1977, during which he saw Espinoza enter and leave that warehouse regularly.

FBI Agent Dauwalder testified that at the time of the search of J–E's premises on August 13, 1976, he saw a sign on the door of Espinoza's office in J–E's warehouse reading "Joe Espinoza," and saw on a desk in that office business cards reading "J–E Enterprises, Joe Espinoza," and that Espinoza received several telephone calls in that office, quoted prices over that telephone and had a catalog of J–E Enterprises with prices written in it on his desk there and requested Dauwalder not to seize that catalog, because he needed it to transact business.

The admissibility of Holdren's testimony identifying Espinoza as the person with whom he spoke by telephone is governed to some extent by Rules 901(a) and 104(b) of the Federal Rules of Evidence.[14] Under the provisions thereof, it was not requisite to the admissibility of Holdren's testimony that it be sufficient itself to support a finding that it was Espinoza to whom Holdren

---

14. Rule 901(a) provides:

(a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

Rule 104(b) provides:

(b) Relevancy conditioned on fact. When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

spoke by telephone; Holdren's testimony was properly admissible, under the provisions of Rule 104(b),[15] "upon, or subject to, the introduction of [other] evidence sufficient to support a finding of the fulfillment of the condition," that is, other evidence which would be sufficient to support a finding that Espinoza was the person to whom Holdren spoke by telephone, the establishment of the identity of Espinoza as that person being requisite to the relevancy of Holdren's testimony.

■ Testimony of a telephone conversation had between a witness and another person may be conditionally admitted, regardless of which of them initiated or answered the call, even though the witness cannot certainly identify the person with whom he spoke by voice identification, and the identity of the person with whom the witness is alleged to have had the conversation may be established by circumstantial evidence. *Cwach v. United States*, 212 F.2d 520 (8th Cir. 1954); *United States v. John*, 518 F.2d 705 (7th Cir. 1975); *United States v. Lococo*, 450 F.2d 1196 (9th Cir. 1971); *Noriega v. United States*, 437 F.2d 435 (9th Cir. 1971), *cert. denied*, 402 U.S. 908, 91 S.Ct. 1380, 28 L.Ed.2d 648 (1971); *Carbo v. United States*, 314 F.2d 718 (9th Cir. 1963), *cert. denied*, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964); *United States v. Martinez*, 555 F.2d 1248 (5th Cir. 1977), *cert. denied*, 434 U.S. 924, 98 S.Ct. 404, 54 L.Ed.2d 282 (1977); *Grogan v. United States*, 394 F.2d 287 (5th Cir. 1967), *cert. denied*, 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 100 (1967).

Here the circumstantial evidence tending to identify Espinoza as the person with whom Holdren spoke in the telephone conversation in which he communicated his order for kiddie porn to J–E is strong and compelling.

Furthermore, establishing the identity of a person by evidence that he made a reply or response in a manner that was expected to be evoked by a communication made to him by another who cannot identify him is well-recognized and time-honored.[16] In *Van Riper v. United States*, 13 F.2d 961, 968 (2d Cir. 1926), Judge Learned Hand writing for the Court said:

> If, for example, a man were to write a letter properly addressed to another, and were to receive a telephone call in answer, professing to come from the addressee, and showing acquaintance with the contents of the letter, it would in our judgment be a good enough identification of the speaker to allow in the proof, though in the end, or course, the issue of identity would be for the jury. This is the reasoning on which a complete correspondence is admitted, once its origin is established, so long as it continues to be consecutive in substance.

Here, the evidence of Espinoza's response to Holdren's telephoned order to J–E for kiddie porn almost certainly identifies Espinoza as the "Joe" to whom Holdren spoke in that conversation: Holdren communicated to J–E, by speaking with "Joe," Holdren's order for kiddie porn, in response to which kiddie porn was shipped from J–E to Holdren (Kip's Discount) along with J–E's invoice therefor listing the kiddie porn thereon as "bulbs," per Holdren's testimony, and Holdren paid J–E the amount of that invoice by his check. These facts, standing alone, perhaps would not be sufficiently probative of Espinoza's identity, as the "Joe" to whom Holdren communicated the order and as a person involved in J–E's response to that order, to permit Holdren's testimony to the telephone conversation to be sufficiently relevant to remain before the jury as to Espinoza. But given the additional evidentiary fact that the invoice rendered by J–E to Holdren for the kiddie porn *bore the fingerprint of Espinoza*, then compelling evidence existed tending not

---

**15.** *See* the Notes of the Advisory Committee on Proposed Rules, as to Rule 901(a), which state in part: "The requirement of showing . . . identity falls in the category of relevancy dependent upon fulfillment of a condition of fact and is governed by the procedure set forth in Rule 104(b)."

**16.** *See* Weinstein's Evidence, Section 901(b)(6) 102, p. 901–86.

only to establish that Espinoza had a personal role in the making of J–E's response to Holdren's order, thereby sufficiently identifying him as the "Joe" to whom Holdren spoke in the telephone conversation in which he made that order and rendering Holdren's testimony with regard thereto relevant, but also to establish independently that Espinoza was a member of the alleged conspiracy.

In *Davis v. United States*, 279 F.2d 576, 579 (4th Cir. 1960), this court partially relied upon evidence of the response made by Davis, to a telephoned communication to him by an undercover agent who did not then personally know him, to hold Davis thereby to have been sufficiently identified to permit the undercover agent's testimony about the telephone conversation to be admitted.[17]

The court committed no error by admitting Holdren's testimony.

█ Early on during the government's direct examination of witness Holdren, he testified that during the Richard Torch pornography trial, he had entered into an agreement with the United States Attorney under the terms of which he had been granted immunity "for any pornography dealings through August 1, 1977," for his testimony against Torch and Torch's employer, Majestic News, but he did not "believe" anyone else.

Later on in that direct examination, to the question, "Mr. Holdren, during the course of your business, *and specifically during the time period the fall of 1976 until the spring of 1977*, did you deal with other distributors of adult materials?" (emphasis added), Holdren answered, "Yes," and further testified that he had so dealt with

"approximately six other companies," and then to the question, "Did you *ever* deal with any other distributors other than J–E that deal in adult materials involving children?" (emphasis added), he answered, "Not to my knowledge."

Thereafter, on cross-examination by Mr. Diamond, Espinoza's counsel, Holdren was asked, "What other distributors have you been dealing with *over the years* that deal with sexually explicit materials?" (emphasis added), to which Holdren responded, "I refuse to answer that question on the grounds that I ·may incriminate myself," and Holdren added, "He is not giving a time period." Mr. Diamond then moved the court to direct Holdren to answer the question and the court declined to do so.

Espinoza asserts here that the court erred by declining to direct Holdren to answer Espinoza's questions as propounded, arguing that in so doing the court denied him his right to cross-examine Holdren, because Holdren had voluntarily answered the government's question whether he had "ever" dealt with any other distributors that dealt in adult materials involving children.

In the light of Holdren's testimony on direct that he had been immunized against prosecution for his pornography dealings only through August 1, 1977, and the government's first question to him, which was limited to his dealings in adult materials "specifically during the time period the fall of 1976 until the spring of 1977," it was reasonable for Holdren to assume that the government's next question—whether he "ever" dealt in adult materials involving children—when taken in the context of that

---

17. In *Davis v. United States*, 279 F.2d 576, 579 (4th Cir. 1960), the Court said: "[C]omplaint is made that an undercover agent was permitted to testify about a telephone conversation he had with Davis, who was not then personally known to him. This conversation is connected to Davis by much more than his telephonic announcement of himself. The testimony shows that shortly after the conversation, Davis requested Johnson to deliver a package to a man, whom he would meet at a designated time and place, and collect a certain sum of money.

Both Johnson and the agent testified that the delivery and collection were accomplished and the agent testified it was in accordance with the arrangement he had made with Davis during the telephone conversation. Furthermore, on a later occasion the agent again spoke to Davis on the telephone when a second officer, with Davis, could positively identify Davis as the speaker. The first agent testified he recognized the voice he heard during the second conversation as that of the man with whom he spoke during the first."

first question, referred to the period to which that first question was limited and meant, to Holdren, the specific time period to which that first question was specifically limited and meant to him no time or period after August 1, 1977, when he had no immunity.

Espinoza's counsel did not, nor did he offer to, rephrase the question he had asked and Holdren had refused to answer so that, as rephrased, it would have limited its enquiry to the period ending August 1, 1977, when Holdren's immunity expired, notwithstanding that Holdren complained that counsel was not "giving a time period." Holdren apparently believed, not without reason, that in answering the question, as phrased, he would have been required to disclose dealings of his which occurred after August 1, 1977, and thus incriminate himself, and for that reason claimed his Fifth Amendment privilege.

Under the circumstances, the court committed no error in declining to force Holdren to answer, did not deny Espinoza his lawful right of cross-examination, and Espinoza suffered no prejudice by the court's refusal.

## VIII.

■ Espinoza assigns as error the court's admitting the testimony of Tom Pidgeon.

Pidgeon testified that from September, 1974, until April 27, 1978, he operated a bookstore in Des Moines, Iowa, that dealt in hard core pornography, ninety-five percent of which was supplied to him by J–E; that he talked by telephone with Joe Espinoza at J–E several times during that period; that in the fall—about the middle of September—of 1976, Pidgeon had a telephone conversation with Espinoza at J–E in which Pidgeon ordered films depicting children involved in explicit sex acts, including the Ball Busters, Lolita and Lollypops series,[18]

which were shipped to and received by Pidgeon in Des Moines; and with regard to that order of those films, Pidgeon testified that he, Pidgeon, "called him [Espinoza] I think two or three weeks before he was getting some [of those films] in, and then when he got them in he called me." Pidgeon's order was placed in that call of Espinoza's made in reply to Pidgeon's earlier telephoned enquiry to Espinoza.

■ As to Pidgeon's identification of Espinoza as the person with whom he spoke, we reiterate: Establishing the identity of a person by evidence that he made a reply or response in a manner that was expected to be evoked by a communication made to him by another who cannot identify him is well-recognized and time-honored. *Van Riper v. United States, supra.* The factor which entered into Pidgeon's identification of Espinoza, and caused that identification to be sufficient to warrant the court's admitting into evidence Pidgeon's testimony concerning his telephone conversations with Espinoza, was Espinoza's *reply telephone call* made back to Pidgeon for the purpose of informing Pidgeon that J–E had received the kiddie porn that J–E had expected in—and about which Pidgeon had enquired in his earlier telephone conversation with Espinoza—and that J–E had the kiddie porn available to sell and ship to Pidgeon. Of course, the ordering by Pidgeon of kiddie porn in that reply conversation, and J–E's shipment and Pidgeon's receipt thereof, further circumstantially strengthens his identification of Espinoza.

It was Espinoza's contention that he was only minimally connected with J–E's operations from sometime in 1975, when he resigned as its president, until about March, 1977, when he resumed its management upon the disappearance of Manuel Lopez.

Pidgeon's testimony tended to controvert that contention as well as to establish that Espinoza had "knowledge"[19] that J–E was

---

18. The kiddie porn which the indictment charged J–E and Espinoza with having transported here included three differently titled films of each of the Ball Busters and the Lollypops series.

19. Rule 404(b), Federal Rules of Evidence, provides:

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not

dealing in obscene matter, particularly kiddie porn, in 1976, contrary to Espinoza's contention that he had none.

During Pidgeon's testimony the court properly instructed the jury that Pidgeon's testimony was admitted because it related acts similar to those with which the defendants were charged; that the jury should keep in mind that the defendants were not on trial for any of the acts related in Pidgeon's testimony; and that his testimony should be considered by the jury insofar, if at all, as in the jury's opinion it had some value toward showing the opportunity, preparation, plan, identity, motive, intent, or knowledge of the defendants, if any, in connection with the offenses charged in the indictment, because it was not admitted for any other purpose.

Pidgeon's testimony was properly admitted.

### IX.

Espinoza attached as an exhibit to his reply brief filed here what appear to be excerpts from the official transcript of the record of the trial and related criminal proceedings had July 18–22, 1977, in the United States District Court for the Southern District of West Virginia, in Charleston, in the case of *United States v. Richard A. Torch*, Criminal Action No. 77–20027 (Torch transcripts).

Espinoza asserts that Holdren testified as a government witness against Torch in his trial and against Espinoza in his later trial; that the same Assistant United States Attorney was one of counsel for the government in both trials; and that in Espinoza's trial, Holdren answered, "Not to my knowledge," to the government's question, "Did you ever deal with any other distributors other than J–E that dealt in adult material involving children?" This assertion appears to be accurate.

Espinoza contends that when the Torch transcript is read with relation to that question and Holdren's answer thereto, the answer is shown to have been false to the knowledge of that Assistant United States Attorney. Of course, if such contention is true, and Espinoza's conviction was in fact the result of the knowing use of perjured testimony in violation of his due process rights, then his conviction must be set aside if there is any reasonable likelihood that such false testimony could have affected the judgment of the jury. *Miller v. Pate*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

A careful analysis of the Torch transcript and the Espinoza record before us belies that contention. In the Espinoza record, when Holdren testified about "adult material involving children," he clearly thereby intended and meant "hard core [pornography]" depicting "penetration and sometimes orgasm" by children involved in sexual acts, called "kiddie porn," whereas it appears from the Torch transcript that while the matter there did depict scenes of nude children, it did not depict them engaged in obscene or other sexual acts.[20] Thus, from the records before us, it cannot be said that Holdren testified falsely in that particular in Espinoza's trial.

Espinoza claims the Assistant United States Attorney representing the government at his trial (government's attorney) was guilty of misconduct by (1) securing and examining a defense exhibit delivered to the Clerk of the United States District Court for the Southern District of West Virginia, before his trial, and (2) suggesting during cross-examination of Espinoza and during closing argument that Espinoza had

---

admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**20.** In Pidgeon's testimony, "hard core" pornography was defined to be pictures of nude persons engaged in explicit sex acts, and "soft core" pornography was defined to be pictures of nude persons not so engaged.

a brochure involving child pornography by waving that brochure before Espinoza and the jury.

This first alleged act of misconduct arose as follows: Apparently in response to a subpoena served by Espinoza upon the custodian of records of the State of California's Department of Justice, requiring that he produce before the court at Espinoza's trial the arrest record and fingerprint record of Manuel Lopez on file in his office, that custodian mailed, addressed to the United States District Court for the Southern District of West Virginia, at Charleston, a sealed envelope containing those records, together with a cover letter of transmittal of them addressed to Espinoza's counsel. Apparently, that Clerk opened the envelope and, mistakenly believing it was intended for the government's attorney, delivered it to the government's attorney's office and it came into his hands in that manner. The government's attorney represented to the court that he did not notice that the documents were intended for delivery to Espinoza's counsel until after he had permitted a government witness to see them.

Espinoza moved for a mistrial, claiming that he was prejudiced, because he was denied the benefit of the "psychological surprise impact" of being able to present damaging evidence on a surprise basis to a government witness.

The court indicated, and we agree, that no harm had been done Espinoza. He was not thereby prejudiced.

As to the second alleged act of misconduct, the record reflects that on the day following the government's attorney's completion of the cross-examination of Espinoza, he moved for a mistrial, asserting the government's attorney had asked him an improper question on cross-examination. At the time the question was asked and answered, Espinoza made no objection. Espinoza testified on cross-examination that it could be yes or no that he had handled materials involving or purporting to involve teenagers, and the government's attorney asked him to inspect one of Spartan Mail Service's fliers. He inspected it, said he recognized it, and he was then asked what title it listed on a certain line. He responded, "Teen Sucker No. 9."

The district court properly overruled Espinoza's motion for a mistrial on this point.

The record indicates that the government's attorney had in his hand momentarily a brochure during his final argument, and Espinoza's counsel commented, "Your Honor, the prosecutor now has a document which is not in evidence and he's trying to wave it in front of the jury. I think that's improper, your Honor, and I would ask the Court not to let him do that." The court enquired of the government's attorney if he intended to "use" whatever it was that he had in his hand, and he replied that he "would not," and the matter ended there.

Espinoza suffered no prejudice from this incident.

Having found no error, as asserted by Espinoza, in the instructions given by the court, nor with respect to any other point raised on appeal, we affirm the conviction.

AFFIRMED.